# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

|  |  |  |
|---|---|---|
| **DOUGLAS JUSZYNSKI,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 06 CV 5503** |
| vs. | ) | |
| | ) | **Judge Joan H. Lefkow** |
| **LIFE INSURANCE COMPANY OF** | ) | |
| **NORTH AMERICA,** | ) | |
| | ) | |
| **Defendant.** | ) | |
| | ) | |

## MEMORANDUM OPINION AND ORDER

After plaintiff Douglas Juszynski ceased work in July 2001 due to peripheral

neuropathy and back, neck, and leg pain, he applied for long-term disability ("LTD") benefits,

which defendant Life Insurance Company of North America ("LINA") approved and began

paying on January 1, 2002.  On September 30, 2005, LINA terminated Juszynski's benefits.

After LINA denied his appeals, Juszynski brought suit against LINA pursuant to ERISA §

502(a)(1)(B) (29 U.S.C. § 1132(a)(1)(B)), seeking reinstatement of LTD benefits.  Both parties

have stipulated that the court may (1) consider the claim record without any further

authentication or foundation and (2) conduct a trial on the papers submitted by the parties and

issue judgment pursuant to Fed. R. Civ. P. 52. Juszynski has moved for summary judgment

pursuant to Fed. R. Civ. P. 56 or, in the alternative, entry of judgment in his favor pursuant to

Fed. R. Civ. P. 52.  The defendant has filed a cross-motion for summary judgment pursuant to

Fed. R. Civ. P. 56 or, in the alternative, entry of judgment in its favor pursuant to Fed. R. Civ. P. 52.

For the following reasons, Juszynski's motion [#37] will be granted, LINA's motion [#41] will be denied, and the court will enter judgment pursuant to Rule 52 in favor of Juszynski.

## FACTUAL BACKGROUND

Juszynski worked for Marconi Medical Services, Inc. as a Senior Service Engineer from February 24, 1969 until July 5, 2001. Pl.'s Statement of Fact ("SF") ¶ 6. As a benefit of his employment, Juszynski received LTD coverage under a group insurance plan. Pl.'s SF ¶ 7. On July 5, 2001, Juszynski ceased working due to peripheral neuropathy and back, neck, and leg pain. Pl.'s SF ¶ 6. These symptoms stemmed from a number of conditions, including cervical and lumbar spondylosis, gait ataxia, and degenerative joint disease.[1] Pl.'s SF ¶ 10.

In December 2001, Juszynski applied to LINA for LTD benefits. Under the policy, disability is defined as (1) the inability of the employee "to perform all the material and substantial duties of *his or her regular occupation*, or . . . to earn more than 80% of his or her Indexed Covered Earnings" or (2) after benefits have been payable for 24 months, the inability of the employee "to perform all the material and substantial duties *of any occupation* for which he or she may reasonably become qualified based on education, training or experience, or . . . to earn more than 80% of his or her Indexed Covered Earnings." Def.'s SF ¶ 9 (emphasis

---

[1] Juszynski also alleges that he became disabled in July 2001 due, in part, to diabetes mellitus, though LINA denies that there is any evidence that he suffered from this condition at that time. LINA further argues that plaintiff's list of disabling conditions should include "chronic alcoholism and cerebellar degeneration as a result of same." Def.'s Resp. to Pl.'s SF ¶10.

added).  In December 2001, Juszynski's primary care physician, Dr. Peter MacEntee, identified the illnesses and symptoms that caused him to stop working as (1) peripheral neuropathy, (2) cerebellar degeneration, (3) chronic alcoholism, (4) gout, (5) recurrent falls, and (6) multiple fractures.  Def.'s Resp. to Pl.'s SF ¶ 25; Def.'s Ex. A, at LINA 462–63.  Dr. MacEntee also opined that due to Juszynski's severe physical limitations and the likelihood of continued deterioration, he was permanently disabled.  Def.'s Ex. A, at LINA 462–63.  LINA approved LTD benefits commencing on January 1, 2002, at a rate of $2,772 per month.  Pl.'s SF ¶ 12.

Juszynski also applied for Social Security Disability Insurance Benefits.  Pl.'s SF ¶ 20. On March 31, 2001, the Social Security Administration determined that he was disabled as of July 3, 2001 and entitled to benefits.  Pl.'s SF ¶ 20.  Beginning in January 2002, Juszynski received $1,598 per month in social security benefits, which LINA offset against its LTD benefits payments so that Juszynski's net monthly benefit from LINA was $1,174.  Pl.'s SF ¶ 20.

On June 19, 2002, Dr. MacEntee sent a follow-up evaluation form to the insurance company opining that due to severe peripheral neuropathy, "patient is permanently disabled." Pl.'s SF ¶ 26; Def.'s Ex. A, at LINA 393.  On October 18, 2002, Dr. MacEntee again opined that Juszynski was permanently disabled and also classified Juszynski's physicial impairment as "Class 5," which is defined as "severe limitations of functional capacity; incapable of minimal sedentary activity."  Def.'s Resp. to Pl.'s SF ¶ 27.

On August 1, 2003, LINA contacted Juszynski to inform him that the end of the initial 24-month period of his disability benefits was approaching and that it had begun investigating

whether he was eligible for continued benefits under the "any occupation" definition of disability in the policy. Def.'s SF ¶ 27.

In October and November 2003, Juszynski underwent femoral popliteal bypass surgeries in both extremities in an effort to treat his peripheral arterial disease[2] and occlusion. Both of these surgeries were performed by vascular surgeon Dr. Anwar S. Choudry. Def.'s SF ¶ 28. On December 17, 2003, Dr. Choudry reported on a follow-up medical request form that Juszynski was unable to work at that time and that it was unknown whether he would be able to perform essential job functions. Def.'s Resp. to Pl.'s SF ¶ 31; Def.'s Ex. A, at LINA 302.

On January 22, 2004, after reviewing his updated medical information, LINA informed Juszynski that it had approved continued LTD benefits based on its determination that he was totally disabled from performing any occupation. Def.'s SF ¶¶ 30–31. In its letter to Juszynski, LINA noted that it would "periodically request from you and your attending physician, proof of your continuing total disability from any occupation. The payment of future benefits will depend on this certification . . . ." Def.'s SF ¶ 31.

In March 2005, MRI findings showed degeneration in both the cervical spine and the lumbar spine.

On July 28, 2005, LINA learned that Juszynski had last been seen by Dr. Choudry on August 31, 2004 and had missed his scheduled follow-up visit with Dr. Choudry in February 2005. Def.'s SF ¶ 34. On August 22, 2005, LINA wrote to Juszynski, requesting updated medical information and completion of a medical disclosure authorization, as well as a

---

[2] Peripheral arterial disease is a form of peripheral vascular disease and involves narrowing and hardening of the arteries. *Embry* v. *Barnhart*, No. 02 C 3821, 2003 WL 21704425, at *2 n.6 (N.D. Ill. July 18, 2003).

disability questionnaire, by September 6, 2005. When LINA did not receive a response to its first request, it again wrote to Juszynski, and advised him that if LINA did not receive the requested information, it would assume that he was no longer claiming disability benefits. Def.'s SF ¶ 36.

On October 6, 2005, LINA conducted a "second eye review" of Juszynski's claim and decided to terminate his benefits. Def.'s SF ¶¶ 37–38. On October 7, 2005, LINA sent a letter to Juszynski stating that it terminated benefits because it had not received any medical evidence to substantiate Juszynski's continued total disability from any occupation. Def.'s SF ¶ 38.

Juszynski contends that he had responded to LINA's request and provided updated information in a timely fashion, citing notes in LINA's records confirming receipt of a letter dated September 12, 2005. Pl.'s Resp. to Def.'s SF ¶ 38. LINA's notes indicate that the correspondence from Juszynski was "received in incoming mail on 10/10/05. However mail was dated 09/12/05. Unsure if it was misplaced in other persons claim file or not." Def.'s Ex. A, at LINA 574.

On October 17, 2005, Juszynski submitted his first appeal to LINA, requesting reconsideration of its decision to terminate his LTD benefits. Def.'s SF ¶ 41. In his appeal, Juszynski identified his attending physicians as primary care physician Dr. MacEntee, neurologist Dr. Nestor Ivkov, and cardiologist Dr. Gutom Patel. Def.'s SF ¶ 43. LINA contacted each of the three physicians and requested updated medical information. Def.'s SF ¶ 43.

Dr. Patel returned a blank physical ability assessment form, referring LINA to Juszynski's primary care physician, Dr. MacEntee. Def.'s SF ¶44. Dr. Ivkov returned the

forms, but only provided the date of the last and next office visit and referred LINA to Juszynski's medical records, which Dr. Ivkov had attached. Def.'s SF ¶ 46. Dr. Macentee provided a completed physical ability assessment form which restricted Juszynski's ability to walk and stand to "occasionally," or less than 2.5 hours in an 8 hour work day, and concluded that Juszynski was totally disabled due to a number of conditions, including diabetes, gout, and peripheral neuropathy. Pl.'s Resp. to Def.'s SF ¶ 48; Def.'s Ex. A, at LINA 193–94. LINA notes that Dr. MacEntee "plac[ed] no restriction on Plaintiff's ability to sit," Def.'s SF ¶ 48, but it is not clear from the form that Dr. MacEntee's omission of any information about Juszynski's ability to sit (by leaving that section of the form blank) was meant to indicate that Juszynski had no physical limitations in that area; rather, it appears equally likely that Dr. MacEntee simply failed to complete that section of the form.[3] Dr. Choudry also returned a medical request form in which he did not identify any restrictions or limitations on Juszynski, but referred LINA to Juszynski's primary care physician, Dr. MacEntee. Pl.'s Resp. to Def.'s SF ¶ 51; Def.'s Ex. A, at LINA 136–38.

Two individuals at LINA, Nurse Case Manager Alan Pieper and Assistant Medical Director Dr. John Mendéz, reviewed the medical records in Juszynski's file. On January 24, 2006, Pieper opined that Dr. MacEntee's restrictions and limitations were not supported by any

---

[3] The court's conclusion that the lack of information here does not demonstrate the absence of disability (in terms of Juszynski ability to sit) is also supported by Dr. MacEntee's conclusion at the end of the same form that Juszynski was "totally disabled," as well as by more detailed assessments completed by Dr. MacEntee, both before and after he submitted this form, in which he noted substantial limitations on Juszynski's ability to sit. *See* Def. Ex. A, at LINA 320–21 (limiting Juszynski's ability to sit to only "occasionally," or less than 2.5 hours, in a form dated November 17, 2003); *id.* at LINA 100–103 (limiting Juszynski's ability to sit to less than 2 hours, in a form dated June 6, 2006).

diagnostic testing or exam findings. Def.'s SF ¶ 52. On or around January 31, 2006, Dr. Mendéz opined that the most recent notes in Juszynski's file, dated November 14 to December 19, 2005, did not list any significant physical limitations and did not support the limitations and restrictions provided by Dr. MacEntee, who on November 17, 2005 had opined that Juszynski was totally disabled. Def.'s SF ¶¶ 53–54.

On February 7, 2006, LINA contacted Juszynski via telephone and communicated its decision to uphold its denial of LTD benefits. Def.'s SF ¶ 55. During the telephone call, LINA explained that its basis for denial was that neither Juszynski's neurologist nor his cardiologist had provided any restrictions that would preclude his return to work. Def.'s SF ¶ 56. LINA also sent Juszynski a letter dated February 7, 2006, outlining the reasons for its denial and concluding that "there is no documentation of significant physical limitations, such as significant loss of range of motion and/or strength deficits that would preclude you from returning to work" and "the restrictions provided by Dr. MacEntee on November 17, 2005 do not correlate with the available medical documentation." Def.'s SF ¶ 57.

On February 15, 2006, LINA received a completed physical ability assessment form from neurologist Dr. Ivkov, which opined that Juszynski could sit between 2.5 and 5.5 hours and stand or walk not more than 2.5 hours per day during an 8-hour work day. Def.'s SF ¶¶ 60–61. Dr. Ivkov also noted that when Juszynski came for his appointment, he was limping and using a cane and that he had an antalgic gait. Pl.'s SF ¶ 41.

On or around June 9, 2006, plaintiff made a second appeal to LINA, requesting again that they reconsider their decision to terminate LTD benefits. Def.'s SF ¶ 62. On July 6, 2006, LINA referred the file for medical review and a transferable skills analysis. Def.'s SF ¶¶

63–64.  On July 10, 2006, Vocational Rehabilitation Counselor Adrian P. Jenkins conducted a transferable skills analysis in which he concluded that Juszynski was capable of performing either of two occupations:  Customer Support Specialist or Test Fixture Designer.  Def.'s SF ¶¶ 65–66.  On July 12, 2006, Lead Medical Director Marie F. Hatam conducted a review of the medical information in Juszynski's file and concluded that "[t]he medical records reviewed support the [physical assessment form] filled out by Dr. Ivkov on February 15, 2006, which support [the restrictions and limitations] and the positions found by [the transferable skills analysis] at sed[entary] level of capacity."  Def.'s SF ¶ 67.

On July 25, 2006, LINA again upheld its termination of LTD benefits.  As support for its decision to deny Juszynski's second appeal, LINA (1) cited the physical ability assessment form completed by Dr. Ivkov, (2) stated that "the medical documentation does not support Mr. Juszynski's inability to function in a sedentary capacity," and (3) cited the transferable skills analysis in which Jenkins concluded that Juszynski was capable of performing either of two occupations that "fall within the sedentary occupation category."  Def.'s SF ¶ 68.

## STANDARDS

Both Jusznyski and LINA have moved for summary judgment[4] or, alternatively, requested that the court resolve the issues in this case pursuant to Rule 52 of the Federal Rules of Civil Procedure by conducting a trial on the papers and entering findings of fact and conclusions of law.  *See Crespo* v. *Unum Life Ins. Co. of Am.*, 294 F. Supp. 2d 980, 991–92 (N.D. Ill. 2003) (describing the concept of a trial on the papers pursuant to Rule 52).  The

---

[4]  Summary judgment obviates the need for a trial where there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c).

parties have also stipulated that the court may consider the claim record without any further authentication or foundation.

The court finds that given the fact-intensive issues on which this case turns, review under Rule 52, rather than Rule 56, is appropriate here. *See Marshall* v. *Blue Cross Blue Shield Ass'n*, No. 04 C 6395, 2006 U.S. Dist. LEXIS 68956, at *2–6 (N.D. Ill. Sept. 13, 2006). "To the extent any conclusion of fact herein is more properly characterized as a conclusion of law, it should be so construed, and vice-versa with respect to conclusions of law." *Id.* at *6 n.4.

## ANALYSIS

### I.  Standard of Review under ERISA

At issue in this case is whether Juszynski is entitled to continued LTD benefits.  As a preliminary matter, the court must determine which standard of review under ERISA is applicable to this case.  The Supreme Court has established that "[d]ecisions of [ERISA] plan administrators presumptively receive de novo review, but if the plan establishes discretionary authority then review will be deferential." *Perlman* v. *Swiss Bank Corp. Comprehensive Disability Protection Plan*, 195 F.3d 975, 980 (7th Cir. 1999) (citing *Firestone Tire & Rubber Co.* v. *Bruch*, 489 U.S. 101, 115, 109 S. Ct. 948, 103 L. Ed. 2d 80 (1989)).  In this case, LINA has not argued that the plan contains any language granting such discretionary authority to LINA.  The court agrees with both parties' contention that the proper standard of review in this case is de novo.

### II.  Juszynski's Continued Disability

Juszynski argues that LINA produced no evidence that Juszynski's medical condition improved and argues that once an insurer approves a claim, it cannot terminate benefits if the

claimant's medical condition worsens.  Defendant, on the other hand, characterizes as a red herring Juszynski's argument that LINA had to show that his condition improved and contends that (1) the policy places the burden on the plaintiff to establish continued disability and (2) the sum total of the evidence favors termination of Juszynski's benefits.

### A.  The Burden of Proof

LINA notes that the policy at issue specifically states that for benefits to continue, a claimant is required to provide satisfactory proof of disability, including proper documentation of continued care by a physician.  LINA further relies on *Lockhart* v. *Jefferson Pilot Financial Insurance Co.*, No. 03 C 1745, 2005 U.S. Dist. LEXIS 6955, at *50 & n.41 (N.D. Ill. Mar. 29, 2005), for the proposition that this provision places the burden on the plaintiff to provide sufficient proof of continued disability.  The court agrees that under the terms of the policy, Juszynski bears the burden of providing proof of his continued disability.

Juszynski notes, however, that *Lockhart* involved the burden of establishing disability when making an initial claim for benefits, whereas in the present case, the plaintiff had already begun receiving LTD benefits based on defendant's earlier finding that he was totally disabled from performing any occupation.  *See id.*  Juszynski further cites a number of cases in which courts held that once an insurer approves a claim, it cannot terminate benefits unless either the claimant's medical condition improves or the information available to the insurer otherwise changes in some significant way.  *See Ladd* v. *ITT Corp.*, 148 F.3d 753 (7th Cir. 1998); *McOsker* v. *Paul Revere*, 279 F.3d 586, 589 (8th Cir. 2002); *Nickola* v. *CNA Group Assurance Co.*, No. 03 C 8559, 2005 U.S. Dist. LEXIS 16219, at *25 (N.D. Ill. Aug. 5, 2005).  In *Ladd*, the Seventh Circuit held that the defendant's denial of the plaintiff's claim "must be adjudged

arbitrary, and even irrational," in part because no one who had ever examined the plaintiff, including the doctor selected by the defendant insurance company, believed that she was capable of working. 148 F.3d at 755. In *McCosker*, another court stated that "unless information available to an insurer alters in some significant way, the previous payment of benefits is a circumstance that must weigh against the propriety of an insurer's decision to discontinue those payments." 279 F.3d at 589. The court further noted that "in determining whether an insurer has properly terminated benefits that it initially undertook to pay out, it is important to focus on the events that occurred between the conclusion that benefits were owing and the decision to terminate them." *Id.* at 590. Similarly, in *Nickola*, a court in this district found,

> as common sense also would suggest, if an insurer has already admitted that someone is so incapacitated that they are entitled to long-term disability payments, one can reasonably view the failure to produce evidence of improvement as a suspicious failing if the insurer decides that LTD benefits are no longer warranted.

2005 U.S. Dist. LEXIS 16219, at *25 (citing *McOsker*, 279 F.3d at 589). Thus, while Juszynski bears the burden of proving continued disability and attendance to a physician, the fact that LINA had already approved LTD benefits may weigh in favor of Juszynski if LINA has failed to produce evidence that either the claimant's medical condition improved or the information available to the insurer otherwise changed in some significant way.

### B.  The Weight of the Evidence

The totality of the evidence favors continuation, not termination, of Juszynski's LTD benefits. The claim record contains consistent and largely uncontradicted reports by Dr. MacEntee, from as early as 2001 that, in his opinion, Juszynski was permanently disabled due to a number of degenerative ailments, including peripheral neuropathy, cervical and lumbar

11

spondylosis, gait ataxia, gout, cerebellar degeneration, and degenerative joint disease. Def.'s

Ex. A, at LINA 100–03; *id.* at 193–94; *id.* at 319–21; *id.* at 393; *id.* at 462–63. As detailed

below, it appears that in reaching its decision to terminate benefits, LINA relied on selective

excerpts from Juszynski's medical records rather than the record in its entirety. *See Wilkes* v.

*UNUM Life Insurance Co. of Am.*, No. 01-C-182-C, 2002 U.S. Dist. LEXIS 8763, at *28 (W.D.

Wis. Jan. 29, 2002).

### 1. LINA's View of the Evidence

LINA cites the following items in support of its contention that "[t]he vast majority of

medical opinions contained in the claim file support LINA's determination":

(1) neurologist Dr. Ivkov's "certifi[cation] that Plaintiff was capable of performing the

duties of a sedentary occupation when he assessed Plaintiff to be able to sit up to 5.5

hours and stand and walk up to 2.5 hours each in a regular 8 hour work day . . . ";

(2) "the opinions of Drs. Choudry and Patel, who both concur with the neurologist in

that neither one of them restricted Plaintiff from working in his own or any occupation

after Plaintiff's recovery from his femoral popliteal by-pass surgeries in 2003";

(3) "not one of Plaintiff's specialists ever opined during the course of their treatment

that Plaintiff was totally disabled from working in any occupation as a result of his

complaints . . . "; and

(4) "[o]nly Dr. MacEntee, a general practitioner or family doctor without any

specialization or expertise in treating neurological and orthopaedic conditions such as

Plaintiff's, (eventually) placed restrictions and limitations on Plaintiff preventing him

from performing even sedentary occupations."

Def.'s Resp. to Pl.'s Mot. at 1–2 (footnote omitted). In its review of the claim record, however, the court finds that these four items, whether considered individually or in aggregate, provide only marginal support for LINA's contention that benefits should have been terminated.

First, LINA's contention that Dr. Ivkov "certified that Plaintiff was capable of performing the duties of a sedentary occupation" is not corroborated by the record. In the documents upon which LINA relies, Dr. Ivkov merely checked a box indicating his opinion that Juszynski could sit between 2.5 and 5.5 hours and stand or walk not more than 2.5 hours per day during an 8-hour work day. *See* Def.'s Ex. A, at LINA 111–12. As plaintiff notes, the form completed by Dr. Ivkov does not state, much less "certify," that Juszynski is "capable of performing the duties of a sedentary occupation." Indeed, LINA's contention that it "did not have to 'interpret' Dr. Ivkov's abilities assessment to reach this result since the form is clear on its face," Def.'s Resp. to Pl.'s Mot. at 1, is called into question by LINA's own enlistment of a vocational rehabilitation counselor to evaluate Juszynski's employability within the restrictions placed upon him by physicians due to his medical conditions. Additionally, as Juszynski notes, the term "sedentary" is a term of art utilized by both the Department of Labor and the Social Security Administration, and the Social Security Administration has explained that in "sedentary work," sitting would generally total about 6 hours of an 8-hour workday." Social Security Ruling No. 96-9p, 1996 SSR LEXIS 6, at *8 (SSA July 2, 1996). While rulings by the Social Security Administration are not applicable under ERISA, the Seventh Circuit has held that "the guiding principles developed in those cases may be 'instructive' in ERISA cases." *Halpin* v. *W.W. Grainger, Inc.*, 962 F.2d 685, 695 n.11 (7th Cir. 1992). In any case, the court is not convinced that, standing alone, a physician's determination that an individual is able to

sit between 2.5 and 5.5 hours and stand or walk not more than 2.5 hours per day during an 8-hour work day indicates that he is capable of performing the duties of a sedentary occupation—an inference which would appear to assume that the individual is capable of consistently sitting and standing for lengths of time at or above the daily maximum levels to which the physician restricted him.

Second, "the opinions of Drs. Choudry and Patel" neither stand alone as support for terminating benefits nor "corroborate" LINA's interpretation of Dr. Ivkov's findings. In response to LINA's request for updated medical information in early 2006, Dr. Choudry returned a request form in which he left no response—affirmative, negative, or otherwise—to any of LINA's questions regarding physical restrictions, including "What are the specific restrictions that you placed on your patient?" and "Could your patient return to work at this time if no accommodations were made for the listed restrictions?" Def.'s Ex. A, at LINA 136–38. Dr. Choudry referred LINA to Dr. MacEntee for "any further questions." Id. at LINA 136. Similarly, as defendants admit, "Dr. Patel returned a blank physical ability assessment form and follow-up medical request form, only referring to Dr. Ivkov's or Dr. Macentee's records and treatment." Def.'s SF ¶ 44; *see also* Def.'s Ex. A, at LINA 224–26.

While LINA argues that Drs. Choudry and Patel's responses demonstrate that they "both *concur with* the neurologist in that neither one of them restricted Plaintiff from working in his own or any occupation after Plaintiff's recovery from his femoral popliteal by-pass surgeries in 2003," the court's analysis of the records does not support this interpretation. Def.'s Resp. to Pl.'s Mot. at 1–2 (emphasis added). The record likewise does not support LINA's assertion that "Plaintiff's other treating physicians *deferred to* Dr. Ivkov's opinion as

opposed to challenging it." Def.'s Resp. to Pl.'s Mot. at 3 (emphasis added).  The portions of

the record cited by LINA provide no indication that either Dr. Patel or Dr. Choudry was even

aware of—much less "concurred with" or "deferred to"—Dr. Ivkov's February 15, 2006 report.

Furthermore, although a person's silence in response to a question may sometimes indicate a

negative answer, *see, e.g.*, *Alejo Jimenez* v. *Heyliger*, 792 F. Supp. 910, 917 (D.P.R. 1992),

such is not the case here, where Drs. Choudry and Patel indicated neither that Juszynski had

any particular physical restrictions nor that he did not have any restrictions.  For example, the

form returned blank by Dr. Patel provided the doctor an opportunity to indicate if Juszynski

had physical limitations in particular categories, and Dr. Patel did not so indicate.  But the form

also provided Dr. Patel with a comparable opportunity to indicate if Juszynski was capable of

functioning "Continuously (67%-100%) (5.5+ hrs)" in particular categories, and Dr. Patel did

not indicate that either.  *See* Def.'s Ex. A, at LINA 225–26.

The doctors' return of an incomplete (as in the case of Dr. Choudry) or blank (as in the

case of Dr. Patel) request form referring LINA to contact another physician (Dr. MacEntee)

cannot fairly be interpreted as affirmative evidence that Juszynski had no physical limitations.

Thus, even if, as LINA suggests, the court gives relatively more weight to the opinions of the

specialists than those of plaintiff's primary care physician, *see Ketcher* v. *Chater*, No. 95-7068,

1996 U.S. App. LEXIS 3122 (10th Cir. 1996), LINA has only limited evidence—specifically,

Dr. Ivkov's February 15, 2006 report—upon which to rely for its contention that the

specialist's opinions differed substantially from that of Juszynski's primary care physician.

Third, LINA's contention that "not one of Plaintiff's specialists ever opined during the

course of their treatment that Plaintiff was totally disabled from working in any occupation,"

Def.'s Resp. to Pl.'s Mot. at 1–2, suffers from limitations much like those of defendant's arguments concerning the non-responsive reports of Drs. Choudry and Patel.  While the fact that none of Juszynski's specialists ever opined that Juszynski was totally disabled from working in any occupation certainly does not support plaintiff's claim that benefits were wrongly terminated, *see NLRB* v. *Louis A. Weiss Mem'l Hosp.*, 172 F.3d 432, 444 (7th Cir.1999) (noting that "[a]n absence of evidence does not cut in favor of the one who bears the burden of proof"), this absence of information likewise offers only limited support for LINA's contention that its decision to terminate benefits was correct.  Furthermore, as Jusznyski notes, LINA had a contractual right to compel him to attend a physical examination by an independent physician.  In *Hightshue* v. *AIG Life Insurance Co.*, 135 F.3d 1144 (7th Cir. 1998), the Seventh Circuit stated,

> When it is "possible to question the fiduciaries' loyalty, they are obliged at a minimum to engage in an intensive and scrupulous independent investigation of their options to insure that they act in the best interests of the plan beneficiaries." *Leigh* v. *Engle*, 727 F.2d 113, 125–26 (7th Cir.1984).  Seeking independent expert advice is evidence of a thorough investigation, and provided that the fiduciary has investigated the expert's qualifications, has provided the expert with complete and accurate information, and determined that reliance on the expert's advice is reasonably justified under the circumstances, the fiduciary's decision will be respected, despite the conflict of interest.

*Id.* at 1148.  In this case, while there is a clear basis to question whether LINA's financial interests may affect its objectivity in deciding whether or not to terminate benefits, there is no evidence that LINA made any effort to obtain an independent assessment of Juszynski's physical limitations.

LINA further argues that while Juszynski's degenerative disc disease, spondylosis, and stenosis allegedly worsened, he failed to seek additional diagnostic or specialist treatment from a neurosurgeon, orthopedic surgeon, pain specialist, or physiatrist to treat his pain.  LINA cites

*Brown* v. *UNUM Provident*, No. 03 CV 0912, 2005 WL 2861100 (N.D. Ohio Nov. 1, 2005),

for the proposition that this failure on Juszynski's part "compels the conclusion the neither one

of his orthopaedic conditions is in fact disabling." Def.'s Resp. to Pl.'s Mot. at 2. Defendants'

reliance on *Brown*, however, is unpersuasive. As LINA itself notes in a parenthetical, the court

in *Brown* held that "it was . . . rational for Defendant to conclude Plaintiff was not disabled

because she did not seek *any* other diagnostic testing or *specialist treatment* when she

complained her symptoms were worsening." *Brown*, 2005 WL 2861100, at *5 (emphasis

added). Here, in contrast, the plaintiff sought treatment from at least three specialists,

including a neurologist and a cardiologist whom he consulted regarding the symptoms on

which he bases his LTD benefits claim.

      Fourth, the court is not persuaded by defendant's argument that "[o]nly Dr. MacEntee, a

general practitioner or family doctor without any specialization or expertise in treating

neurological and orthopaedic conditions such as Plaintiff's, (eventually) placed restrictions and

limitations on Plaintiff preventing him from performing even sedentary occupations." Def.'s

Resp. to Pl.'s Mot. at 2. LINA characterizes Dr. MacEntee's opinions as "conclusory remarks"

and cites two cases, *Jordan* v. *Northrop Grumman Corp. Welfare Benefit Plan*, 370 F.3d 869

(9th Cir. 2004), and *Pralutsky* v. *Metropolitan Life Ins. Co.*, 435 F.3d 833 (8th Cir. 2006),

holding that "conclusory remarks" and unsupported opinions are insufficient to prove

disability. Def.'s Mot. Memo. at 9. Unlike the defendants in *Jordan* and *Pralutsky*, however,

LINA has not explained how Dr. MacEntee's reports and opinions can properly be

characterized as either "conclusory remarks" or unsupported opinions.

LINA also contends that "[f]urther weighing against Dr. MacEntee is the fact that he actively supported Plaintiff's pursuit of disability benefits after their termination" and thus "joined Plaintiff's advocacy team when solicited to provid[e] answers to a physical residual functional capacity questionnaire by Plaintiff's counsel and as a result lost his independence." Def.'s Mot. Memo. at 10. LINA's characterization of Dr. MacEntee's role lacks a basis in the record evidence, however, as the reports he submitted to LINA before Juszynski obtained legal representation appear to be consistent with those he provided after. Likewise, the court is not persuaded that Dr. MacEntee was "burdened with the pressure of a personal relationship with [his] patient when providing [his] opinion," Def.'s Mot. Memo. at 11, any more than LINA's in-house consultants were burdened by their employer-employee relationship with the insurer. *See Hawkins* v. *First Union Corporation Long-Term Disability Plan*, 326 F.3d 914, 917 (7th Cir. 2003).[5]

As detailed above, Dr. MacEntee reported to LINA on at least five occasions—in December 2001, June 2002, November 2003, November 2005, and June 2006—that in his opinion, Juszynski was permanently disabled. Def.'s Ex. A, at LINA 100–03; *id.* at 193–94; *id.* at 319–21; *id.* at 393; *id.* at 462–63. From his earliest reports to LINA, Dr. MacEntee consistently diagnosed Juszynski with a number of degenerative ailments, most notably peripheral neuropathy, as well as cervical and lumbar spondylosis, gait ataxia, gout, cerebellar degeneration, and degenerative joint disease. Indeed, LINA's initial decision to approve

---

[5] As the Seventh Circuit explained, "If the incentives of the treating physician and of the plan's consultant are assumed to be equal and opposite, consideration of incentives drops out and the superior information likely to be possessed by the treating physician, especially when as in this case the consultant does not bother to examine the patient, may support the treating-physician presumption after all." *Id.*

benefits was apparently based in significant part on Dr. MacEntee's reports. Of course, this initial approval of benefits was under the "unable to perform all the . . . duties of his . . . regular occupation" standard, rather than the "unable to perform all the . . . duties of any occupation for which he or she may reasonably become qualified based on education, training or experience" standard, which is applicable only after benefits have been payable for 24 months. Nevertheless, LINA apparently saw fit to rely on Dr. MacEntee's reports at that time. The court is skeptical, therefore, of LINA's more recent decision to completely disavow the value and accuracy of Dr. MacEntee's reports concerning Juszynski's physical limitations.

### 2. LINA's Review of Jusznyski's Appeals

Juszynski notes that, unlike the opinions of Drs. MacEntee and Ivkov, which were based on their clinical findings and objective diagnostic results (such as MRI scans), the opinions rendered by LINA's consultants were not based on the results of any first-hand clinical evaluation. LINA argues that its reliance on the opinions of its consultants was in compliance with Seventh Circuit law and should likewise be given weight by the court. Def.'s Rep. to Pl.'s Mot. at 7–8 (citing *Davis* v. *Unum Life Ins. Co.*, 444 F.3d 569, 575 (7th Cir. 2006)). While conceding that *Davis* sanctioned the use by insurers of in-house physicians, Juszynski persuasively distinguishes *Davis*, in which the district court reviewed the insurer's decision under the arbitrary and capricious standard of review, from the present case, where both parties have stipulated to the de novo standard. *Id.* Indeed, when the *Davis* court rejected the plaintiff's contention that the insurer-defendant relied too heavily on its own in-house doctors, it did so squarely in the context of the arbitrary and capricious standard of review. *Id.* Under that standard, the district court "will uphold [an insurer's] denial of benefits so long as

that decision has 'rational support in the record.'" *Id.* at 576. Unlike in *Davis*, the court here is obligated under de novo review to consider not merely whether the opinions of LINA's in-house consultants were rationally supported by the record, but also how much weight to give those opinions relative to those of the other physicians.

In determining how much weight to give the opinions of LINA's own physicians, the court is persuaded that, as Juszynski suggests, LINA's consultants' opinions are entitled to less weight than that of the physicians who conducted in-person evaluations, such as Drs. MacEntee and Ivkov. Not only did LINA's physicians lack first-hand clinical data but, moreover, they relied on a very limited selection of the information available to them. For example, Dr. Mendéz, the LINA physician who reviewed Juszynski's medical records as part of his first appeal, summarily concluded that the "most recent notes dated 11/14/05 and 12/19/05 . . . do not correlate with [Dr. MacEntee's] 11/17/05 recommended restrictions." Def.'s Ex. A, at LINA 124. Similarly, the review by Dr. Hatam, the LINA physician who reviewed Juszynski's medical records as part of his second appeal, consists of a single sentence in which he simply affirmed the validity of (1) Dr. Ivkov's February 15, 2006 report (in which he reported that Juszynski could sit between 2.5 and 5.5 hours and stand or walk not more than 2.5 hours per day) and (2) the transferable skills analysis conducted by Adrian P. Jenkins, LINA's own Vocational Rehabilitation Counselor (who opined that Juszynski was capable of performing in a sedentary occupation).[6] *See id.* at LINA 65, 73. The transferable skills analysis report to

---

[6] Juszynski also argues that in conducting the transferable skills analysis, Jenkins failed to properly take into account Juszynski's age. Because the court has already found that the transferable skills analysis was predicated on an unreasonably selective view of the available medical evidence regarding Juszynski's physical limitations, however, the court will not consider further bases upon which the results of this analysis may be questionable.

which Dr. Hatam refers appears, in turn, to be based largely, if not exclusively, on the same February 15, 2006 report by Dr. Ivkov and to have been conducted in the absence of consideration of any other reports, such as those of Dr. MacEntee. *See id.* at LINA 73; Def. Mot. Memo. at 8 (noting that the transferable skills analysis was "[b]ased on the medical restrictions and limitations identified by Dr. Ivkov" in his February 15, 2006 report). Thus, LINA's basis for affirming its termination of benefits effectively rests entirely on a single report. For the reasons discussed above, however, the court finds that Dr. Ivkov's February 15, 2006 report—regardless of the various LINA consultants who apparently adopted or affirmed it—does not, standing alone, support the broad conclusions which LINA purports to draw from it.

LINA further argues that when it initially approved benefits under the "unable to perform all the . . . duties of any occupation" standard, it did so "*solely* . . . on the basis of peripheral vascular disease during the recovery from by-pass surgery." Def.'s Resp. to Pl.'s Mot. at 3 (citing Def.'s SF ¶¶ 28-30 (citing Def.'s Ex. A, at LINA 287–91, 293–94, 296–97)) (emphasis added). The court's review of the documents cited by LINA in support of this contention, however, found no definitive indication that Juszynski's convalescence from the vascular surgery was the sole reason that LINA initially approved benefits under the "unable to perform all the . . . duties of any occupation" standard. Even if the court were to accept LINA's contention, however, the court would nevertheless find LINA's review of Juszynski's disability claim to be defective. As LINA states,

> LINA neither assessed Plaintiff's conditions of peripheral neuropathy and cerebellar degeneration, stenosis, and degenerative disc disease with a view towards Plaintiff's ability to perform in a sedentary occupation nor approved continued benefits ***on that basis***.

Def.'s Mot. Memo. at 13 (emphasis in original). This assertion prompts the court to question why LINA failed to assess Juszynski's degenerative conditions as they might affect his ability to perform in a sedentary occupation. After all, when LINA first informed Juszynski that it had approved benefits under the "unable to perform all the . . . duties of any occupation" standard, it provided no indication that it had done so solely on the basis of his recovery from vascular surgery. *See* Def.'s Ex. A, at LINA 285. Indeed, LINA's letter provides no mention of the basis for LINA's decision, though it does indicate that "*continued* Long-Term Disability benefits have been approved." *See id.* (emphasis added). Thus, in light of the fact that LINA initially approved Juszynski's benefits (albeit under the "unable to perform all the . . . duties of his . . . regular occupation" standard) on the basis of peripheral neuropathy and back, neck, and leg pain, Pl.'s SF ¶ 6, it escapes the court why LINA would neglect entirely to consider those same degenerative conditions in determining whether to continue or terminate benefits. While neither party has presented evidence that any of those degenerative conditions ever improved, plaintiff has cited substantial evidence that these degenerative conditions worsened.

LINA's overarching argument in support of its denial of benefits appears to be that Juszynski did not meet his burden of proof. As discussed above, however, the weight of evidence in the record indicates that he was entitled to continued benefits.[7] While LINA argues

---

[7] LINA also contends that it was justified when it initially terminated benefits based on Juszynski's failure to respond in a timely fashion to LINA's requests for follow-up information that LINA requested after learning that Juszynski had missed a follow-up appointment with Dr. Choudry regarding his vascular surgery. Juszynski argues that this initially-provided reason for termination is different from, and incompatible with, that provided by LINA as to why it denied his subsequent appeals. In response, LINA denies Juszynski's contention that it "shifted reasons" for termination and argues that "LINA upheld its termination on the same grounds because *Plaintiff had still failed to provide sufficient proof of eligibility as the evidence supported his ability to work in a sedentary occupation*." Def.'s Resp. to Pl.'s Mot. at 7

that "the vast majority of medical opinions contained in the claim file support LINA's determination," Def.'s Resp. to Pl.'s Mot. at 1, the documents LINA cites provide limited support for LINA's conclusion that Juszynski was not disabled. The form completed by Dr. Ivkov on February 15, 2006 stands alone as the only substantial evidence on which LINA relied for its decision to terminate LTD benefits. As discussed above, however, LINA's nearly singular reliance on this report was not merited.

The court also notes that in terminating Juszynski's benefits, LINA failed to take into account not only the opinions and reports of Dr. MacEntee but also the Social Security Administration's determination that Juszynski was disabled. LINA was certainly aware of the Social Security Administration's determination that Juszynski was disabled, as the offset of his social security benefits reduced LINA's payment obligations to Juszynski by $1,598 per month. For purposes of social security benefits determinations, "disability" is statutorily defined as the "inability to engage in any substantial gainful activity." 42 U.S.C. § 423(d)(1)(A). While the Social Security Administration's award of benefits is not binding in ERISA actions, *Anderson*

_____

(emphasis in original). LINA cites *Layman* v. *Continental Casualty Co.*, No. 97-72528, 1999 U.S. Dist. LEXIS 2802 (E.D. Mich. Feb. 2, 1999), for the proposition that lack of proper medical treatment and care with an appropriate physician works as an absolute bar to any payment of benefits. LINA's suggestion that Juszynski, like the plaintiff in *Layman*, failed to obtain proper medical treatment and care with an appropriate physician, however, is supported by the record only to the extent that Juszynski missed a follow-up appointment with vascular surgeon Dr. Choudry; even if the court accepts LINA's contention that his missing that appointment led LINA to reasonably believe that Juszynski had ceased treatment with Dr. Choudry, it does not follow that Juszynski had therefore ceased obtaining treatment and care from any physicians. Indeed, the perspective that Juszynski's recovery from vascular surgery was the sole possible basis for continued LTD benefits was unique to LINA. As discussed above, LINA revealed this perspective to Juszynski only after he appealed the termination of his benefits. In any case, the court is not convinced that Juszynski's alleged failure to respond to LINA's requests constituted a valid basis for terminating benefits.

v. *Operative Plasterers' & Cement Masons' Int'l Ass'n Local No. 12 Pension & Welfare Plans*, 991 F.2d 356, 358–59 (7th Cir.1993), courts in this district have found that the findings of the Social Security Administration are compelling evidence of a claimant's disability with respect to an ERISA claim. *La Barge* v. *Life Ins. Co.*, No. 00 C 0512, 2001 U.S. Dist. LEXIS 1033 (N.D. Ill. Feb. 5, 2001); *see also White* v. *Airline Pilots Ass'n*, 364 F. Supp. 2d 747, 767 (N.D. Ill. 2005) (citing *Ladd* v. *ITT Corp.*, 148 F.3d 753, 755–56 (7th Cir. 1998)) ("[A] determination of disability under the Social Security Act can be considered when applicable."). Thus, while it was certainly within LINA's discretion to disregard the Social Security Administration's determination that Juszynski was disabled, the fact that it did so is consistent with the court's finding that LINA took a selective view of the available evidence regarding Juszynski's physical limitations.

### III. LINA's After-the-Fact Rationale for the Denial of Benefits

In its briefs on the presently considered motions, LINA offers an additional reason for terminating benefits that it did not raise prior to the commencement of this lawsuit: that the policy's alcoholism limitation makes Juszynski ineligible for benefits once 24 months of LTD benefits have been paid. The policy states that LINA

> will pay Disability Benefits on a limited basis during an Employee's lifetime for a Disability caused by, or contributed to by, any one or more of the following conditions. Once 24 monthly Disability Benefits have been paid, no further benefits will be payable for any of the following conditions.
> 1. Alcoholism
> . . .

Def.'s Ex. A, at LINA 21. LINA asserts that Juszynski had a 35-year history of alcohol abuse and in 2001, after he initially became disabled, was still drinking several glasses of wine per day, despite his physician's repeatedly urging him to stop consuming alcohol. In particular,

LINA cites the August 16, 2001 report of neurologist Dr. Ivkov, who diagnosed Juszynski with peripheral neuropathy, cerebellar degeneration, gout, gait ataxia, and recurrent falls, which he opined were "associated with" or "related to" alcohol abuse. *See* Def.'s Ex. A at LINA 425–26.

In response, Juszynski concedes that medical reports from August to October 2001 document Dr. Ivkov's opinion at that time that the conditions from which Juszynski suffered were related to alcoholism, as well as Dr. MacEntee's notation that Juszynski was abusing alcohol at that time. Juszynski argues, however, that the references to alcoholism cited by LINA in its briefs and in its Rule 56.1 statement are the only references to Juszynski's alcohol use that appear in the record—an assertion that LINA has not challenged. Juszynski also notes that LINA has failed to acknowledge evidence, both from Dr. Ivkov's February and August 2002 reports and from Dr. MacEntee's November 21, 2001 report, that Juszynski stopped drinking as of the end of October 2001. Def.'s Ex. A, at LINA 367, 369, 465.

In contrast to the burden of proving continued disability, which plaintiff bears, "[t]he burden of proving that a claim falls within an exclusion rests squarely on the insurer." *Deal* v. *Prudential Ins. Co. of Am.*, 263 F. Supp. 2d 1138, 1143 n.2 (N.D. Ill. 2003) (citing *Hurst-Rosche Eng'rs, Inc.* v. *Commercial Union Ins. Co.*, 51 F.3d 1336, 1342 (7th Cir.1995)). Beyond LINA's recent assertion in its legal memoranda that the alcoholism limitation applies to Juszynski's claim, the only apparent evidentiary bases that LINA cites in support of applying the limitation are the few references to alcoholism (discussed above) that appear in the record. In light of Dr. Ivkov's August 2001 report, the court has little doubt that Juszynski's symptoms *at that time* were, at the least, exacerbated by his alcoholism. LINA, however, has provided

absolutely no documentation, medical or otherwise, that the conditions from which Juszynski suffered from January 2002 onward—after he apparently stopped drinking—were necessarily caused by or contributed to by alcoholism. Without any such documentation or expert opinion, the court cannot speculate as to whether or to what degree the alcoholism documented in 2001 may have affected Juszynski's symptoms in subsequent years. The court thus finds that LINA has not provided sufficient evidence that the limitation applies.

Juszynski also argues that, in any case, LINA must be found to have waived its right to raise the exclusion, because the record contains no documentation or suggestion that the alcoholism limitation applied to Juszynski's claim. As Juszynski notes, LINA was well aware of the 2001 medical reports mentioning alcoholism yet chose not to either investigate the issue or assert, prior to the commencement of this litigation, that the alcoholism limitation applied. Juszynski cites a number of cases in which the court found that an insurer waives defenses to coverage not articulated to the insured during the claims review process where the insurer had sufficient information to investigate and raise those defenses if it had so chosen. *See Lauder* v. *First Unum Life Ins. Co.*, 284 F.3d 375, 381 (2d Cir. 2002); *Marolt* v. *Alliant Techsystem, Inc.*, 136 F.3d 617, 620 (8th Cir. 1998). In *Lauder*, for example, the Second Circuit applied the following rule: "[A]n insurer is deemed, as a matter of law, to have intended to waive a defense to coverage where other defenses are asserted, and where the insurer possesses sufficient knowledge (actual or constructive) of the circumstances regarding the unasserted defense." 284 F.3d at 381 (citing *New York* v. *AMRO Realty Corp.*, 936 F.2d 1420, 1431 (2d Cir. 1991)). Similarly, in *Marolt*, the Eighth Circuit held,

> The fact is, the [plan administrator] did not provide a rationale for its decision. The [plan administrator]'s failure in this regard was contrary to the ERISA statute, federal

regulations, and this court's longstanding precedent. *See* 29 U.S.C. § 1133(1) . . . . *We will not permit ERISA claimants denied the timely and specific explanation to which the law entitles them to be sandbagged by after-the-fact plan interpretations devised for purposes of litigation.*

146 F.3d at 620 (additional citations omitted) (emphasis added).

In response, LINA cites at length from *Hillstrom* v. *Kenefic*, 484 F.3d 519 (8th Cir. 2007), in which the court noted that under de novo review of a denial of benefits, a district court "must consider all of the provisions of the policy in question if those provisions are proffered to the trial court as a reason for denial of coverage, even where not relied upon by the plan administrator at the time the denial was made." *Id.* at 528 (internal quotation marks omitted). Rather than disturb its precedent in *Marolt* (where it held that ERISA protects claimants "sandbagged by after-the-fact plan interpretations"), however, the Eighth Circuit specifically noted in *Hillstrom* that "after-the-fact interpretations are not at issue here."[8] *Id.* Thus, the implications that *Hillstrom* has for this case, where LINA's invocation of the alcoholism limitation was undoubtedly after-the-fact, are far from clear.

Juszynski persuasively argues that LINA's attempt to invoke the alcoholism limitation only after the conclusion of its own claim reviews is prohibited by ERISA. Like the court in *Marolt*, Jusznyski cites 29 U.S.C. §1133, which states that "every employee benefit plan" must

> (1) provide adequate notice in writing to any participant or beneficiary whose claim for benefits under the plan has been denied, setting forth the specific reasons for such denial, written in a manner calculated to be understood by the participant, and
> (2) afford a reasonable opportunity to any participant whose claim for benefits has been denied for a full and fair review by the appropriate named fiduciary of the decision denying the claim.

---

[8] Indeed, the court found, "Nothing of substance has been advanced in the litigation that was not raised in the administrative process." *Id.* at 527.

*Id.* Juszynski also cites 29 C.F.R. § 2560.503, which echoes the same requirement.

Allowing LINA to apply the alcoholism limitation only after terminating his benefits and denying both of his appeals would effectively undermine ERISA's statutory requirement that a claimant be provided adequate notice of "specific reasons for such denial" and afforded reasonable opportunity for review by the insurer. Thus, although the court has already found that LINA failed to provide sufficient evidence that the alcoholism limitation applies, the court is also persuaded that, in any case, LINA effectively waived the limitation by failing to comply with the requirements of 29 U.S.C. §1133.

**CONCLUSION AND ORDER**

For the reasons discussed above, the court enters judgment pursuant to Rule 52 in favor of Juszynski. Plaintiff's motion [#37] is granted, and defendant's motion [#41] is denied. The court hereby enters an order requiring LINA to (1) reinstate Jusznyski's benefits in the amount of $1,174 per month, retroactive to October 1, 2005; and (2) compensate Juszynski for any

unpaid benefits past due, including prejudgment interest at the prime rate, compounded monthly.[9] The plaintiff may petition for fees pursuant to Local Rule 54.3.

Dated: March 27, 2008                    Enter: _____

                                         JOAN HUMPHREY LEFKOW
                                         United States District Judge

---

[9] *See Cement Division* v. *City of Milwaukee*, 144 F.3d 1111, 1114 (7th Cir. 1998) (awarding "interest at the market rate, which means an average of the prime rate for the years in question"); *see also Gorenstein Enterprises, Inc.* v. *Quality Care-USA, Inc.*, 874 F.2d 431, 436 (7th Cir. 1989) ("There is no federal statutory interest rate on prejudgment interest."). In *Gorenstein*, the Seventh Circuit announced the "rule that prejudgment interest should be presumptively available to victims of federal law violations. Without it, compensation of the plaintiff is incomplete and the defendant has an incentive to delay." *Id.*; *see also Fritcher* v. *Health Care Service Corp.*, 301 F.3d 811, 819–20 (7th Cir. 2002) (upholding the award of prejudgment interest in ERISA case). Given the Seventh Circuit's guidance and the fact that "[t]he plaintiff is an unsecured, uninsured creditor, and the risk of default must be considered in deciding what a compensatory rate of interest would be," *Gorenstein*, 874 F.2d at 436, the court finds that the prime rate is appropriate in this case.